UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X   Civil Action No. 20-cv-04370 (DLC)
JN CONTEMPORARY ART LLC,

                                Plaintiff,         **COMPLAINT**
                                                  **(Jury Trial Demanded on all**
      -against-                        **non-equitable claims)**

PHILLIPS AUCTIONEERS LLC,

                                  Defendant.
-------------------------------------------------------------------X

       Plaintiff JN CONTEMPORARY ART LLC ("JNCA" or "Plaintiff"), by its attorney,

AARON RICHARD GOLUB, ESQUIRE, P.C., as and for its complaint against Defendant

PHILLIPS AUCTIONEERS LLC ("PA" or "Defendant"), alleges as follows:

## THE PARTIES

       1.    At all relevant times, Plaintiff was and is a domestic limited liability

company duly organized under the laws of the State of New York, with an office located at 980

Madison Avenue, New York, New York 10075.

       2.    Upon information and belief, at all relevant times, Defendant was and is a

foreign limited liability company duly organized under the laws of the State of Delaware and

upon information and belief is authorized to conduct business in the State of New York, with its

principal place of business located at 450 Park Avenue, New York, New York 10022.

## JURISDICTION

       3.    This is a civil action over which this Court has original jurisdiction under

the provisions of 28 U.S.C sec. 1332(a)(1) the diversity jurisdiction statute.  Complete diversity

of citizenship exists between all proper parties to this action.

4.      Plaintiff, a New York limited liability company, is a citizen of New York, asserts claims arising from a breach of contract against Defendant, which is a limited liability company incorporated in the State of Delaware.  Upon information and belief, none of the members of Defendant are domiciled in the State of New York.  Complete diversity exists between the parties in this action.

5.      This Complaint seeks equitable and injunctive relief and alternatively, inter alia, compensatory damages believed to be in excess of USD $7,000,000.00 (USD seven million dollars) exclusive of costs, interest, consequential and incidental damages related thereto. Accordingly the amount in controversy is in excess of the statutory minimum of seventy-five thousand dollars ($75,000.00).

## BACKGROUND

6.      Plaintiff is an art gallery in the business of buying, selling and exhibiting works of art.

7.      Defendant is an auction house in the business of, inter alia, taking works of art on consignment for public or private auction.

**A.      The Basquiat Guarantee Agreement**

8.      Plaintiff and Defendant entered into an agreement, exclusively drafted by Defendant and dated June 27, 2019 ("Basquiat Guarantee Agreement") concerning a work of art described as "*Untitled*, Executed in 1981" by the artist Jean-Michel Basquiat ("Basquiat Painting").

9.      The very first paragraph of the Basquiat Guarantee Agreement provides:

2

> "**Conditional upon signature by you [Plaintiff] of the Consignment Agreement with Guarantee of Minimum Price** in respect of the work by Rudolf Stingel, *Untitled, 2009* (Contract Number 04NYD752) ***and*** **conditional upon the above mentioned Property** [Rudolf Stingel, *Untitled, 2009]* **being offered for sale with a commitment by Phillips to pay the Seller [Plaintiff] a Guaranteed Minimum you [Plaintiff] agreed that you will provide a third-party guarantee obligation** ('Guarantee Obligation')" (first paragraph) (emphasis supplied).

10.     The Basquiat Guarantee Agreement further provides, inter alia, that Plaintiff must submit an irrevocable bid for the Basquiat Painting in the sum of GBP £3,000,000.00 (three million pounds sterling), plus pay all applicable fees and premium, at the June 27, 2019 auction, as follows:

> i.    "**You [Plaintiff] agree** that in accordance with the terms of this Agreement, **you will have the obligation to Phillips to buy the Property [Basquiat Painting] for GBP 3,000,000 (three million pounds sterling) *plus* full standard buyer's premium** ('Buyer's Premium') and any applicable Artist Resale Royalty ("ARR"), VAT and import duties (the 'Guarantee Obligation')" (par. 1);

> ii.   "**You agree to complete and submit to Phillips an irrevocable bid (the 'Irrevocable Bid') on the Property at the Auction in the amount of GBP 3,000,000** (three million pounds sterling) ***or***, if you fail to submit such bid, **we will be entitled to record the Irrevocable Bid** in the auctioneer's book and enter the bid **on your behalf at the above amount**" (par. 2); and

> iii.  "You agree that the Irrevocable Bid is submitted on the understanding **that it may not be revoked, amended or withdrawn**." (par. 3).

## B.    Plaintiff Fully Performed The Basquiat Guarantee Agreement

11.     The Basquiat Painting was Lot no. 19 in Defendant's 20th Century & Contemporary Art Evening Sale, held on June 27, 2019 in London, England. Plaintiff fully performed the Basquiat Guarantee Agreement and submitted an irrevocable bid in the sum of GBP £3,000,000.00 (three million pounds sterling) at Defendant's June 27, 2019 auction. Another bidder then submitted a higher bid in the sum of GBP £3,200,000.00 (the "Basquiat

Hammer Price") and the Basquiat Painting was sold to the higher bidder.   The buyer also paid Defendant additional costs and a fees, and the total received by Defendant from the buyer of the Basquiat Painting was GBP £3,802,000.00.

12.     Upon information and belief, at the time of the auction, the Basquiat Painting was owned by Plaintiff or one of its two owners Leonid Friedland ("Friedland").  That means that Plaintiff or Friedland received the ***entire*** sum of  GBP £3,802,000.00 without paying anything to a consignor.  If Plaintiff had not bid at the auction, upon information and belief, no other bidder would have participated in the auction of the Basquiat Painting and it would not have sold for the total Hammer Price plus the buyer's premium totaling GBP £3,842,000.00 of which Defendant received GBP £3,802,000.00.

13.     As a result of Plaintiff's full compliance of its obligations pursuant to the Basquiat Guarantee Agreement, Defendant and/or Friedland received the proceeds of the auction with costs and a buyer's premium fee for a total sum of GBP £3,802,000.00.

**C.     The Stingel Consignment With Guarantee Agreement**

14.     An agreement, also exclusively drafted by Defendant and also dated June 27, 2019, was entered into between Plaintiff and Defendant, titled "Consignment Agreement" ("Stingel Consignment With Guarantee Agreement").  Pursuant to the Stingel Consignment With Guarantee Agreement, Plaintiff consigned a work of art titled "*Untitled* 2009" by Rudolf Stingel (the "Stingel Work").

15.     Plaintiff  and Muses Funding I LLC ("MFI") executed a Loan and Security Agreement, dated as of December 27, 2019 (the "Loan and Security Agreement"), pursuant to which Plaintiff granted MFI a first-priority lien in the Stingel Work.  The Stingel Consignment With Guarantee Agreement was amended pursuant to an Amendment To

4

Consignment Agreement dated as of December 27, 2019 ("Amendment") between Plaintiff,

Defendant and MFI.  Pursuant to the Amendment, Plaintiff acknowledged that MFI is a secured

party with, inter alia, a security interest in all of Plaintiff's rights to the Stingel Work.  Defendant

is well aware of the Loan and Security Agreement and that MFI has a security interest in all of

Plaintiff's rights to the Stingel Work.

16.     The Stingel Consignment With Guarantee Agreement provides, inter alia,

that Defendant guarantees that Plaintiff shall receive at least USD $5,000,000.00 (USD five

million dollars), with respect to the sale of the Stingel Work ("Guaranteed Minimum") (par. 11),[1]

which shall be offered for sale in New York in Defendant's major spring 2020 evening auction of

20th Century & Contemporary Art, then scheduled for May 2020 (par. 6(a)).[2]

17.     The Stingel Consignment With Guarantee Agreement also provides, inter

alia, the following:

---

[1] Paragraph 11 provides:

> "11. GUARANTEE OF MINIMUM PRICE

> (a) Subject to: (i) confirmation by Phillips following physical inspection of the Property
> that it is in excellent condition; and (ii) any applicable withdrawal or termination
> provision set forth under this Agreement, Phillips guarantees that you shall receive at
> least USD $5,000,000 (five million United States dollars), with respect to the sale of
> the Property [the Stingel Work] (the 'Guaranteed Minimum')."

[2] Paragraph 6(a) provides in pertinent part, the following:

> "6. PRE-SALE ACTIVITIES

> (a)     The Property shall be offered for sale in New York in our major spring 2020
> evening auction of 20th Century & Contemporary Art *currently scheduled for
> May 2020*. Subject to the foregoing, we have the sole right in our reasonable
> discretion, and as we deem appropriate: (i) to select, change or reschedule the
> place, date and time for the auction *but any change to a later date than May
> 2020 would be subject to your prior written consent*" (emphasis supplied) (par.
> 6(a)(i)).

i. Plaintiff shall receive 80% of the amount by which the final bid price on the Stingel Work (the "Hammer Price") exceeds the Guaranteed Minimum (par. 12(b)[3] and par. 2);

ii. Defendant shall receive 20% of the amount by which the Hammer Price exceeds the Guaranteed Minimum (par. 2);

iii. The Stingel Work shall be offered for sale in New York in Defendant's major spring 2020 evening auction of 20th Century & Contemporary Art, ***scheduled for May 2020*** (par. 6(a))—See footnote 2 quoting par. 6(a)(i);

---

[3] The Stingel Consignment With Guarantee Agreement contains two paragraph 12's. One is titled "Settlement" and the other is titled "Termination." The paragraph 12(b) referred to in this paragraph 17(i) refers to the paragraph 12 titled "Settlement."

Paragraph 12(b) Titled "Settlement" as amended by the Amendment, provides:

 "(b) If the Property is sold in the Auction and the Hammer Price is equal to or exceeds the Guaranteed Minimum, then Phillips or one of Phillips' affiliated companies will pay to you (i) the Guaranteed Minimum no later than two (2) Business Days after Phillips receives the purchase price in full cleared funds from the buyer of the Property (in an amount equal to the Guaranteed Minimum) and (ii) (if the Hammer Price exceeds the Guaranteed Minimum) the Seller's Overage Portion within two (2) Business Days after Phillips receives the Seller's Overage Portion (or any partial payment in respect thereof) from the buyer of the Property in full cleared funds (the Guaranteed Minimum plus the Seller's Overage Portion will be considered the Net Sale Proceeds for purposes of this Agreement)."

Paragraph 2 provides:

 "2. COMMISSION
For our services, we will receive and retain from the proceeds of the sale of the Property (a) a commission from you in the amount equal to twenty percent (20%) of the amount by which the final bid price on the Property (the 'Hammer Price') exceeds the Guaranteed Minimum (as such term is defined in Paragraph 11(a) below): and (b) a commission from the buyer of each Lot sold, which shall be calculated as a percentage of the Hammer Price, as set forth in the Conditions of Sale printed or referred to in the auction catalogue and published at www.phillips.com (the 'Buyer's Premium')."

"Overage" is defined as "the amount by which the Hammer Price of the Property exceeds the Guaranteed Minimum."

"Seller's Overage Portion" is defined "the Overage less the commission payable by you pursuant to Paragraph 2(a) above."

iv.   Defendant may select, change or reschedule the place, date and time for the auction *but any change to a later date than May 2020 is subject to Plaintiff's prior written consent* –See footnote 2 quoting par. 6(a)(i);

v.   Paragraph 17(b) provides: "(b) No term of this Agreement shall be *amended, supplemented or waived unless each of us has agreed to do so in writing;*"

vi.   "In the event that the auction is postponed for circumstances beyond our [Defendant] or your [Plaintiff] reasonable control, including, without limitation, as a result of natural disaster, fire, flood, general strike, war, armed conflict, terrorist attack or nuclear or chemical contamination, we may terminate this Agreement with immediate effect. In such event, our [Defendant] obligation to make payment of the Guaranteed Minimum shall be null and void and we shall have no other liability to you [Plaintiff]." (par. 12(a)).[4]

**D.   The Legal Relationship Between The Basquiat Guarantee Agreement and the Stingel Consignment with Guarantee Agreement**

18.   Pursuant to the express terms of the first paragraph of the Basquiat Guarantee Agreement (see par. 9 above), the Stingel Consignment With Guarantee Agreement and the Stingel Consignment With Guarantee, both executed on June 27, 2019, were consideration for each other.  Plaintiff would not have entered into the Basquiat Guarantee Agreement unless Defendant entered into the Stingel Consignment With Guarantee Agreement.

**E.   Defendant Unlawfully Terminated The Stingel Consignment With Guarantee Agreement**

19.   Until in or about mid-May, 2020, Defendant prominently used the image of the Stingel Work on its website to advertise its Contemporary Art evening auction. The Stingel Work was the only work of art which Defendant repeatedly used to advertise its Contemporary Art evening auction.

---

[4] The paragraph 12(a) referred to in this paragraph 17(vi) refers to the paragraph 12 titled "Termination" in the Stingel Consignment With Guarantee Agreement.

20.     In or about the beginning of May, 2020, Defendant advised Plaintiff that it was rescheduling the May 2020 auction for the end of June, 2020.  Defendant rescheduled the May 2020 auction to June 2020 ***without*** Plaintiff's written consent as expressly required by Paragraphs 6(a)(i) and 17(b) of the Stingel Consignment With Guarantee Agreement. Thereafter, Defendant again postponed the June 2020 auction to July 2, 2020 ***without*** Plaintiff's written consent.

21.     Paragraph 17(d) of the Stingel Consignment With Guarantee Agreement provides in pertinent part (the "Notice Provision"):

> "(d)… Phillips shall send notices to you at the address listed on the first page of this Agreement… ***Notices shall be deemed to have been given five (5) calendar days after mailing to the address referred to above or within one (1) business day of delivery by hand, email, or facsimile.***"
> (emphasis supplied).

22.     On May 30, 2020, Friedland sent an electronic message to Plaintiff's Manager Joseph Nahmad via the computer app known as 'WhatsApp' which contained an image of page 6 of the Stingel Consignment With Guarantee Agreement containing, inter alia, the following excerpt from Paragraph 12(a) (titled "Termination") of the Stingel Consignment With Guarantee Agreement:

> "(a) In the event that the auction is postponed f or circumstances beyond our or your reasonable control, including, without limitation, as a result of natural disaster, fire, flood, general strike, war, armed conflict, terrorist attack or nuclear or chemical contamination, we may terminate this Agreement with Immediate effect. In such event, our obligation to make payment of the Guaranteed Minimum shall be null and void and we shall have no other liability to you."

23.     On June 1, 2020, Friedland sent another electronic message to Mr. Nahmad via WhatsApp.  Friedland attached to the WhatsApp message an unsigned draft of a

letter ("Unlawful Termination Letter"), in violation of the Notice Provision in the Stingel

Consignment With Guarantee Agreement.

24.     The Unlawful Termination Letter purports to unlawfully terminate the

Stingel Consignment With Guarantee, as follows:

> " Dear Mr. Nahmad,
>
> As you are well aware, due to the COVID-19 pandemic, since mid-March 2020 the New York State and New York City governments placed severe restrictions upon all non-essential business activities.  Certain government orders were invoked that applied to and continue to apply to Phillips' business activities.
>
> Due to these circumstances and the continuing government orders, we have been prevented from holding the Auction and have had no choice but to postpone the Auction beyond its planned May 2020 date.
>
> We are hereby giving you notice with immediate effect that: (1) Phillips is invoking its right to terminate the Consignment Agreement; (2) Phillips' obligation to make payment of the Guaranteed Minimum to you for the Property is null and void; and (3) Phillips shall have no liability to you for such actions that required under applicable governing law.
>
> Our rights to act are as mutually agreed by you and us and are clearly set out in paragraph 12 of the Consignment Agreement (titled "Termination") which reads as follows:
>
> > *"(a)  In the event that the auction is postponed for circumstances beyond our or your reasonable control, including, without limitation, as a result of natural disaster, fire, flood, general strike, war, armed conflict, terrorist attack or nuclear or chemical contamination, we may terminate this Agreement with Immediate effect. In such event, our obligation to make payment of the Guaranteed Minimum shall be null and void and we shall have no other liability to you."*

25.     On June 4, 2020, Plaintiff received, by mail, the Unlawful Termination

Letter signed by Defendant.  The postmark on the envelope containing the Unlawful Termination

Letter is dated June 2, 2020.  Pursuant to Paragraph 17(d) of the Stingel Guarantee Agreement,

the Unlawful Termination Letter is deemed to have been received by Plaintiff on June 9, 2020.

26.     Plaintiff would not have entered into the Basquiat Guarantee Agreement unless Defendant entered into the Stingel Consignment With Guarantee Agreement.  Had Plaintiff known that Defendant would not comply with its guarantee obligations to Plaintiff pursuant to the Stingel Consignment With Guarantee Agreement, Plaintiff would never have executed the Basquiat Guarantee Agreement.  The first paragraph of the Basquiat Guarantee Agreement quoted in footnote 5 above, expressly recognizes and acknowledges that Plaintiff would ***not*** have executed the Basquiat Guarantee Agreement had it known that Defendant would ***not*** comply with its guarantee obligations to Plaintiff pursuant to the Stingel Consignment With Guarantee Agreement.

27.     In paragraph 9 of the Amendment, all of the amendments to Paragraph 12 of the Stingel Consignment With Guarantee Agreement (titled "Settlement") are grouped together.  Paragraph 9(a)(v-vi) of the Amendment also amends Paragraph 12(i) of the Stingel Consignment With Guarantee Agreement (titled "Settlement").

28.     During negotiations of the Amendment, Defendant falsely induced Plaintiff and MFI to execute the Amendment as Annette Schwaer ("Schwaer"), Plaintiff's Chief Financial Officer, who signed the Amendment on behalf of Defendant, repeatedly represented to MFI that Plaintiff has never before invoked a termination clause such as Paragraph 12(a) of the Stingel Consignment With Guarantee Agreement (titled "Termination").  Schwaer specifically referenced the September 11, 2001 attacks and declared that Plaintiff did not invoke such a clause even in the aftermath of those tragic events.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Defendant's Breach of the Stingel Consignment With Guarantee Agreement)

29.     Plaintiff repeats and realleges all of the foregoing allegations as if fully set forth herein.

30.     At all times herein mentioned, Plaintiff was ready, willing, and able to perform the terms and conditions of the Stingel Consignment With Guarantee Agreement and did perform all the terms and conditions of the Stingel Consignment With Guarantee Agreement required to be performed on Plaintiff's part.

31.     Plaintiff fully performed the Basquiat Guarantee Agreement.  As a result of Plaintiff's full compliance of its obligations pursuant to the Basquiat Guarantee Agreement, Defendant and/or Friedland received the proceeds of the auction with costs and a buyer's premium fee for a total sum of GBP £3,802,000.00.  If Plaintiff had not bid at the auction, upon information and belief, no other bidder would have participated in the auction of the Basquiat Painting and it would not  have sold for the total Hammer Price plus the buyer's premium totaling GBP £3,842,000.00 of which Defendant received GBP £3,802,000.00.

32.     Plaintiff breached the Stingel Consignment With Guarantee Agreement in, inter alia, the following enumerated respects, each of which constitutes an individual breach of the Stingel Consignment With Guarantee Agreement.

**A.     Defendant Did Not Obtain Plaintiff's Written Consent
to Reschedule The May 2020 Auction**

33.     Pursuant to Paragraphs 6(a)(i) and/or 17(b) of the Stingel Consignment With Guarantee Agreement quoted above, Defendant was required to obtain Plaintiff's written consent to reschedule the May 2020 auction to June 2020 or any date thereafter.  Defendant did

not obtain Plaintiff's written consent to reschedule the May 2020 auction to June 2020 or any date thereafter and therefore breached the Stingel Consignment With Guarantee Agreement.

**B.      Defendant and Its Unlawful Termination Letter
           Did Not Seek Or Obtain Plaintiff's Written Consent**

34.     Defendant's Unlawful Termination Letter provides in pertinent part: "Due to these circumstances and the continuing government orders, we have been prevented from holding the Auction and have had no choice but to postpone the Auction beyond its planned May 2020 date." Defendant never obtained Plaintiff's prior written consent to change the auction to a date later than May 2020 as required by Paragraphs 6(a)(i) and 17(b) of the Stingel Consignment With Guarantee Agreement and therefore breached the Stingel Consignment With Guarantee Agreement.

**C.      The Legal Doctrine of Ejusdem Generis**

35.     Pursuant to, inter alia, the legal doctrine of *ejusdem generis*, viz., words constituting general language of excuse are not to be given the most expansive meaning possible, but are held to apply only to the same general kind or class as those specifically mentioned, the circumstance of the COVID-19 virus is definitively ***not*** in the same class or kind of the specific events stated in Paragraph 12(a), i.e. "natural disaster, fire, flood, general strike, war, armed conflict, terrorist attack or nuclear or chemical contamination." Such clause is not applicable, and by invoking it, and/or using it as a pretext to not perform, Defendant breached the Stingel Consignment With Guarantee Agreement.

**D.      Defendant Is Disingenuously Using COVID-19 As a Pretext To Breach**

36.     Defendant is proceeding with its "major spring 2020 evening auction of 20th Century & Contemporary Art" (par. 6(a) Stingel Consignment With Guarantee Agreement) presently scheduled for July 2, 2020—see par. 48 below. Upon information and belief,

Defendant is **_not_** cancelling its other guarantee agreements or its other consignment with guarantee agreements.

37.     Defendant is unlawfully terminating the Stingel Consignment With Guarantee Agreement, which has been in existence for nearly a year and has been fully performed by Plaintiff and Plaintiff has fully performed the Basquiat Guarantee Agreement on June 27, 2019.

38.     Defendant's unlawful termination of the Stingel Consignment With Guarantee Agreement is **_not_** based on an alleged force majeure provision or on COVID-19. Defendant is making a **_commercial_** decision to illegally terminate a contract based on its belief that the current commercial market for works of art by Rudolf Stingel, is not strong.  Defendant is disingenuously using COVID-19 as a false pretext for an unlawful termination.  This is not a COVID-19 situation and COVID-19 is not specifically included in par. 12(a) titled "Termination."

39.     Defendant is illegally applying force majeure in a discriminatory manner, by, inter alia, unlawfully picking and choosing which contractual commitments it does not want to perform.  Defendant selectively and prejudicially terminated the guarantee but not the auction because of the guarantee provision in Stingel Consignment With Guarantee Agreement which required Defendant to pay Plaintiff the Guaranteed Minimum in the sum of USD $5,000,000.00. However, Defendant is proceeding with its other consignments for its Evening Auction[5] sale scheduled for July 2, 2020 and November, 2020 and upon information and belief is not cancelling any other consignment agreements for its Evening Auction sales.

---

[5] The term "Evening Auction" means Defendant's major evening auction sales of contemporary works of art which take place bi-annually in May and November.

40.     Defendant continues to offer Plaintiff participation in the evening July, 2020 and November, 2020 auction sales in a proposed stripped down agreement which does not contain a guarantee provision.  This action by Defendant confirms that its reason for referencing the force majeure provision in the Unlawful Termination Letter, was legally baseless as Defendant is proceeding with the July and November, 2020 auction sales but offering Plaintiff a stripped down version of the Stingel Consignment With Guarantee Agreement ***without*** the guarantee.

**E.     Defendant's Unlawful WhatsApp Notice**

41.     Pursuant to the Notice Provision in Paragraph 17(d) of the Stingel Consignment With Guarantee Agreement quoted above, "***Notices shall be deemed to have been given five (5) calendar days after mailing to the address referred to above or within one (1) business day of delivery by hand, email, or facsimile.***" (emphasis supplied).

42.     Defendant's alleged WhatsApp message, sent by Defendant to Plaintiff on June 1, 2020, is not a legally valid notice as a WhatsApp message is neither delivery by mail, hand, email nor facsimile as required by Paragraph 17(d) of the Stingel Consignment With Guarantee Agreement.  By not giving appropriate notice, Defendant breached the Stingel Consignment With Guarantee Agreement.

**F.     Defendant Has Not Been Prevented From Holding The Auction**

43.     Defendant's statement in its Unlawful Termination Letter that "Due to these circumstances and the continuing government orders, ***we have been prevented from holding the Auction***" is a falsehood and a breach of the Stingel Consignment With Guarantee Agreement.

44.    Defendant's website https://www.phillips.com has advertised many online auctions held by Defendant as a result of the COVID-19 virus, including without limitation the following online auctions:

i.      Online Auction for May 20 - May 28, 2020  titled "REFRESH: RELOAD Online Auction;"

ii.     Online Auction for May 13 – May 21 titled "Happy Hour: Online Auction;"

iii.    Online Auction for May 13 – May 21 titled "Shaping the Surface: Online Auction;"

iv.     Online Auction for April 2 – May 7, 2020 titled "April Showers: Online Auction;"

v.      Online Auction for April 29 – May 7, 2020 titled "Bloom: Online Auction;"

vi.     Online Auction for April 22 – April 30, 2020 titled "Hard-Edged: Online Auction;"

vii.    Online Auction for April 22 – April 30, 2020 titled "Habitat: Online Auction;"

viii.   Online Auction for April 15 – April 23, 2020 titled "Desktop: Online Auction;"

ix.     Online Auction for April 15 – April 23, 2020 titled "Current Mood: Online Auction."

x.      Online Auction for April 8 - April 16, 2020 titled "Editions Online;"

xi.     Online Auction for May 26 – June 4, 2020 titled "connect /reflect/ COLLECT a selection of contemporary art Online Auction."

45.    Phillip's website contains an online bidding guide and also an online viewing room.

46.    Defendant offers no explanation whatsoever, as to why it could not include the Stingel Work in any of the foregoing sampling of its online auctions.

47.    Defendant's website presently advertises two online auctions for its Contemporary Art department for the period May 26, 2020 to June 4, 2020, and June 5 to June 15, 2020 with an online viewing room.  Again, Defendant offers no explanation whatsoever, as to why it will not or could not include the Stingel Work in any of its May 26, 2020 to June 4, 2020, and June 5 to June 15, 2020 online auctions.

48.    Defendant's website presently advertises three auctions for its 20th Century & Contemporary Art department to take place on July 2, 2020, viz., a morning auction commencing at 10:00 A.M., an afternoon auction commencing at 2:00 P.M., and a late afternoon auction commencing at 5:00 P.M.  Again, Defendant has no explanation as to why it cannot include the Stingel Work in any of the three auctions taking place on July 2, 2020.

49.    Hundreds of owners of works of art have consigned their works of art to Plaintiff for inclusion in the foregoing multiple online auctions and the three in-person auctions scheduled for July 2, 2020.

50.    Defendant's multiple past and future online and in-person Contemporary Art evening auctions in which the Stingel Work could have been auctioned, demonstrates a breach of the Stingel Consignment With Guarantee Agreement.

**G.    The Judicial Relief Sought By Plaintiff As A Result of Defendant's Multiple Breaches of the Stingel Consignment With Guarantee Agreement**

51.    Despite due demand, Defendant has, inter alia, refused to comply with its obligations pursuant to the Stingel Consignment With Guarantee Agreement and the Basquiat Guarantee Agreement.

### i. **Specific Performance**

52.     Plaintiff has performed the obligations on its part pursuant to the Stingel Consignment With Guarantee Agreement and the Basquiat Guarantee Agreement.

53.     Defendant's continuing refusal to comply with its obligations pursuant to the Stingel Consignment With Guarantee Agreement and/or the Basquiat Guarantee Agreement is a continuing breach of the Stingel Consignment With Guarantee Agreement and/or the Basquiat Guarantee Agreement.

54.     Plaintiff has suffered irreparable injury from Defendant's breaches of the Stingel Consignment With Guarantee Agreement and/or the Basquiat Guarantee Agreement and will continue to suffer such injury unless the Court specifically enforces the Stingel Consignment With Guarantee Agreement with a mandatory injunction requiring Defendant to, inter alia:

 i.     Auction the Stingel Work at Defendant's next online or in-person auction of Contemporary Art;

 ii.    If the Hammer Price is less than or equal to the Guaranteed Minimum, Plaintiff shall forthwith pay Plaintiff the Guaranteed Minimum;

 iii.   If the Hammer Price is more than the Guaranteed Minimum, Plaintiff shall receive 80% of the amount by which the Hammer Price exceeds the Guaranteed Minimum; and

 iv.    An Order adjudging and declaring that the Termination Letter, which, inter alia, purports to terminate that Stingel Consignment With Guarantee Agreement, is null and void, and of no legal force or effect.

55.     Monetary damages are not sufficient to provide a full and complete remedy to Plaintiff, as, inter alia, Plaintiff is entitled to receive 80% of the amount by which the Hammer Price exceeds the Guaranteed Minimum and Plaintiff cannot calculate the amount of the 80% unless and until an auction of the Stingel Work has actually occurred.

56.     Defendant is capable of performing its obligations pursuant to the Stingel Consignment With Guarantee Agreement.

57.     The balance of the equities tips sharply in Plaintiff's favor and the issuance of a mandatory injunction.

58.     The public interest would not be disserved by entry of the specific performance injunctive relief requested in this Complaint.

59.     Plaintiff has demonstrated a likelihood of success on the merits.

60.     Plaintiff is therefore entitled to specific performance of Defendant's obligations pursuant to the Stingel Consignment With Guarantee Agreement.

**ii.     Monetary Damages**

61.     In the event the Court will not grant specific performance by Defendant of the Stingel Consignment With Guarantee Agreement, Plaintiff has been damaged in a sum no less than $7,000,000.00, the precise amount to be proven at trial, with appropriate legal interest, including, without limitation, all consequential and incidental damages related thereto and additional damages for the additional interest payments from Plaintiff to MFI on the loan from MFI to Plaintiff pursuant to the Loan and Security Agreement, which loan would have been paid off by Plaintiff by August 2020 had Defendant not breached the Stingel Consignment With Guarantee Agreement.

62.     Plaintiff is further entitled to punitive damages in a sum not less than $10,000,000.00 (ten million dollars) as Defendant's conduct evidenced a high degree of moral culpability and/or was so flagrant and/or so willful, wanton and/or negligent or recklessness as to imply a criminal indifference to civil obligations.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Defendant's Breach of the Basquiat Guarantee Agreement)

63.      Plaintiff repeats and realleges all of the foregoing allegations as if fully set forth herein.

64.      The first  paragraph of the Basquiat Guarantee Agreement provides that Plaintiff's execution of the Basquiat Guarantee Agreement is ***conditioned*** upon the following three events—see paragraph 9 above for the full quote:

    i.      The execution of the Stingel Consignment With Guarantee Agreement;

    ii.     ***And*** the Stingel Work being offered for sale by Defendant;

    iii     ***And,*** that Defendant shall pay Plaintiff the Guaranteed Minimum, i.e. USD $5,000,000.00.

65.      At all times herein mentioned, Plaintiff was ready, willing, and able to perform the terms and conditions of the Basquiat Guarantee Agreement and did perform all the terms and conditions of the Basquiat Guarantee Agreement required to be performed on Plaintiff's part.

66.      As a result of Plaintiff's full performance of its obligations pursuant to the Basquiat Guarantee Agreement, Defendant and/or Friedland received the entire proceeds of the auction with costs and a buyer's premium fee for a total sum of GBP £3,802,000.00.  If Plaintiff had not bid at the auction, upon information and belief, no other bidder would have participated in the auction of the Basquiat Painting and it would not have sold for the total Hammer Price plus the buyer's premium totaling GBP £3,842,000.00 of which Defendant received GBP £3,802,000.00.

**A.     The Judicial Relief Sought By Plaintiff As A Result of Defendant's Breach of the Basquiat Guarantee Agreement**

67.     Despite due demand, Defendant has, inter alia, refused to comply with its obligations pursuant to the Basquiat Guarantee Agreement and/or the Stingel Consignment With Guarantee Agreement.

**i.   Specific Performance**

68.     Plaintiff has performed the obligations on its part pursuant to the Basquiat Guarantee Agreement.

69.     Defendant's continuing refusal to comply with its obligations pursuant to the Basquiat Guarantee Agreement and/or the Stingel Consignment With Guarantee Agreement is a continuing breach of the Basquiat Guarantee Agreement and/or the Stingel Consignment With Guarantee Agreement.

70.     Plaintiff has suffered irreparable injury from Defendant's breaches of the Basquiat Guarantee Agreement and/or the Stingel Consignment With Guarantee Agreement and/or and will continue to suffer such injury unless the Court specifically enforces the Basquiat Guarantee Agreement with a mandatory injunction requiring Defendant to, inter alia:

i.     Auction the Stingel Work at Defendant's next online or in-person auction of Contemporary Art;

ii.    If the Hammer Price is less than or equal to the Guaranteed Minimum, Plaintiff shall forthwith pay Plaintiff the Guaranteed Minimum;

iii.   If the Hammer Price is more than the Guaranteed Minimum, Plaintiff shall receive 80% of the amount by which the Hammer Price exceeds the Guaranteed Minimum; and

iv.    An Order adjudging and declaring that the Termination Letter, which, inter alia, purports to terminate that Stingel Consignment With Guarantee Agreement, is null and void, and of no legal force or effect.

71.     Monetary damages are not sufficient to provide a full and complete remedy to Plaintiff, as, inter alia, Plaintiff is entitled to receive 80% of the amount by which the Hammer Price exceeds the Guaranteed Minimum and Plaintiff cannot calculate the amount of the 80% unless and until an auction of the Stingel Work has actually occurred.

72.     Defendant is capable of performing its obligations pursuant to the Basquiat Guarantee Agreement and/or the Stingel Consignment With Guarantee Agreement.

73.     The balance of the equities tips sharply in Plaintiff's favor and for the issuance of a mandatory injunction.

74.     The public interest would not be disserved by entry of the specific performance injunctive relief requested in this Complaint.

75.     Plaintiff has demonstrated a likelihood of success on the merits.

76.     Plaintiff is therefore entitled to specific performance of Defendant's obligations pursuant to the Basquiat Guarantee Agreement.

**ii.     Monetary Damages**

77.     In the event the Court will not grant specific performance by Defendant of the Basquiat Guarantee Agreement and the Stingel Consignment With Guarantee Agreement, Plaintiff has been damaged in a sum no less than $7,000,000.00, the precise amount to be proven at trial, with appropriate legal interest, including, without limitation, all consequential and incidental damages related thereto and additional damages for the additional interest payments from Plaintiff to MFI on the loan from MFI to Plaintiff pursuant to the Loan and Security Agreement, which loan would have been paid off by Plaintiff by August 2020 had Defendant not breached the Basquiat Guarantee Agreement.

78.     Plaintiff is further entitled to punitive damages in a sum not less than $10,000,000.00 (ten million dollars) as Defendant's conduct evidenced a high degree of moral culpability and/or was so flagrant and/or so willful, wanton and/or negligent or recklessness as to imply a criminal indifference to civil obligations.

## **RESERVATION OF RIGHTS**

This Complaint is without any prejudice whatsoever to, and Plaintiff reserves all of its rights to, amend this Complaint to include causes of action for fraud and/or fraudulent inducement, as discovery in this action progresses.

## **JURY DEMAND**

Plaintiff demands a jury for all non-equitable claims stated herein.

**WHEREFORE**, Plaintiff demands judgment as follows:

a.     On the First Cause of Action, issuing a permanent injunction specifically enforcing the Stingel Consignment With Guarantee Agreement.

In the event the Court will not issue a permanent mandatory injunction, a judgment for a sum no less than $7,000,000.00, the precise amount to be proven at trial, with appropriate legal interest, including, without limitation, all consequential and incidental damages related thereto and additional damages for the additional interest payments from Plaintiff to MFI on the loan from MFI to Plaintiff pursuant to the Loan and Security Agreement, which loan would have been paid off by Plaintiff by August 2020 had Defendant not breached the Basquiat Guarantee Agreement. Plaintiff is further entitled to exemplary damages in a sum to be determined at trial. Plaintiff is further entitled to exemplary damages in a sum no less than $10,000,000.00, the precise amount to be determined at trial;

b.     On the Second Cause of Action, issuing a permanent injunction specifically enforcing the Basquiat Guarantee Agreement.

In the event the Court will not issue a permanent mandatory injunction, a judgment for a sum no less than $7,000,000.00, the precise amount to be proven at trial, with appropriate legal interest, including, without

limitation, all consequential and incidental damages related thereto and additional damages for the additional interest payments from Plaintiff to MFI on the loan from MFI to Plaintiff pursuant to the Loan and Security Agreement, which loan would have been paid off by Plaintiff by August 2020 had Defendant not breached the Basquiat Guarantee Agreement.  . Plaintiff is further entitled to exemplary damages in a sum to be determined at trial.  Plaintiff is further entitled to exemplary damages in a sum no less than $10,000,000.00, the precise amount to be determined at trial;  and

c.      Such other and further relief as the Court may deem just and proper.


Dated: New York, New York
          June 8, 2020

                              AARON RICHARD GOLUB, ESQUIRE, P.C.
                              Attorney for Plaintiff



                              BY: Aaron Richard Golub (ARG 6056)
                              35 East 64th Street, Suite 4A
                              New York, New York 10065
                              Ph: (212) 838-4811
                              argolub@argolub.com
                              nglanc@argolub.com