UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------- X
                                    :
JN CONTEMPORARY ART LLC,            :
                                    :
                      Plaintiff,    :          20cv4370 (DLC)
                                    :
            -v-                     :          OPINION AND ORDER
                                    :
PHILLIPS AUCTIONEERS LLC,           :
                                    :
                      Defendant.    :
                                    :
----------------------------------- X

APPEARANCES

For plaintiff JN Contemporary Art LLC:
Aaron Richard Golub
Nehemiah Glanc
Russell I. Zwerin
Aaron Richard Golub, Esquire PC
35 East 64th Street
Suite 4A
New York, NY 10065

For defendant Phillips Auctioneers LLC:
Luke Nikas
Maaren Alia Shah
Neil Thomas Phillips
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
22nd Floor
New York, NY 10010

DENISE COTE, District Judge:

In June 2019, plaintiff JN Contemporary Art LLC ("JN") and defendant Phillips Auctioneers LLC ("Phillips") entered into two agreements governing the auctioning of two paintings:  one by artist Rudolf Stingel ("Stingel Painting") and another by artist Jean-Michel Basquiat ("Basquiat Painting").  While the Basquiat Painting was sold at a public auction the same day the parties executed those agreements, the Stingel Painting was to be auctioned at an auction then scheduled to occur in New York in May 2020.

After the COVID-19 pandemic swept through New York in the Spring of 2020, Phillips terminated the agreement to auction the Stingel Painting and refused to pay JN the minimum price it was guaranteed in connection with the auction.  JN now seeks an order compelling Phillips to auction the Stingel Painting and pay it in accordance with the terms of the parties' agreement.  Phillips has moved for dismissal of this action.  For the following reasons, the action is dismissed.

## Background

The following facts are taken from the Second Amended Complaint ("SAC") and documents integral to it or incorporated

by reference.[1]  JN buys, sells, and exhibits works of art.
Phillips is an art auction house that takes works of art on
consignment for public or private auction.

In 2019, JN owned the Stingel Painting and Phillips or its
principal owned the Basquiat Painting.  JN agreed to place a bid
at a June 2019 auction for the Basquiat Painting and to consign
the Stingel Painting to Phillips for auction in New York in May
2020.  The agreement was recorded in two June 27, 2019
contracts, which will be referred to as the Basquiat Agreement
and the Stingel Agreement.

Broadly, the Basquiat Agreement obligated JN to place a bid
on the Basquiat Painting at Phillips' 20th Century &
Contemporary Art Evening Sale in London on June 27, 2019.  It
was executed "[c]onditional upon" JN's execution of the Stingel
Agreement and "conditional upon the [Basquiat Painting] being
offered for sale with a commitment by Phillips to pay the Seller
a Guaranteed Minimum" of GBP £3,000,000.  JN agreed to place an
"Irrevocable Bid" of GBP £3,000,000 for the Basquiat Painting at
the auction.  In consideration for JN's irrevocable bid,

_____

[1] The SAC contains a number of conclusions and legal arguments.
Unlike the factual allegations, those portions of the SAC are
not afforded the presumption of truth.  See Bell Atlantic Corp.
v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted) ("[O]n a
motion to dismiss, courts are not bound to accept as true a
legal conclusion couched as a factual allegation.").

Phillips would pay JN a "Financing Fee" of 20% of the purchase amount above GBP £3,000,000, which was referred to as the overage, if JN or an unrelated third party purchased the Basquiat Painting at a price "exceeding GBP [£]3,000,000."

At the June 2019 London auction, JN placed its bid and an unrelated third-party bidder purchased the Basquiat Painting at the auction for GBP £3,200,000 plus additional fees.  There is no allegation that Phillips has not paid JN the Financing Fee described in the Basquiat Agreement.

The Stingel Agreement is identified in its preamble as a Consignment Agreement, with JN listed as the Consignor, the sale date identified as "May 2020," and the Phillips Department listed as "20th Century & Contemporary Art-NY".  The Special Terms listed in the preamble are a Guaranteed Minimum of "USD $5,000,000," subject to the terms of the agreement.

The Stingel Agreement provided that the Stingel Painting "shall be offered for sale in New York in our major spring 2020 evening auction of 20th Century & Contemporary Act currently scheduled for May 2020" ("New York Auction").  JN was not permitted to bid on the painting.  If the painting were not sold at the auction, Phillips would announce that "it has been 'passed,' 'withdrawn' 'returned to owner' or 'bought-in.'"

"Subject to . . . any applicable withdrawal or termination provision," Phillips guaranteed that JN would receive $5 million (the "Guaranteed Minimum") from the sale of the Stingel Painting at the New York Auction.  The Stingel Agreement provided Phillips with a commission from JN equal to 20% of the amount by which the final bid price at the auction of the Stingel Painting exceeded the Guaranteed Minimum, among other things.  Phillips denied that it was making any "representations or warranties to [JN] about the actual price at which [the Stingel Painting] will sell," and JN "agree[ed] not to rely on pre-sale estimates as a prediction or guarantee of the value of a Lot or the price at which it will be sold."

The agreement permitted Phillips to withdraw the painting from the auction "at any time before sale if in our sole judgment after consultation with you . . . just cause exists." In that event, Phillips' "obligation to make payment of the Guaranteed Minimum shall be null and void".  JN was not, however, permitted to withdraw the Stingel Painting "from sale after the date of the Agreement for any reason."

The Stingel Agreement references the schedule of the New York Auction in three additional places.  If the Stingel Painting was damaged prior to the New York Auction, the Guaranteed Minimum "shall be null and void" and JN could "decide

whether to withdraw the [Stingel Painting] or to include

[Stingel Painting] in the next appropriate auction after

restoration has been completed with mutually agreed revised pre-

sale estimates and terms of sale."

The agreement also permitted Phillips to change the auction

date "to a later date than May 2020" with JN's prior written

consent.  After explaining that the New York Auction at which

the Stingel Painting would be offered for sale was currently

scheduled for May 2020, it added that Phillips had

> the sole right in our reasonable discretion, and as we
> deem appropriate:  (i) to select, change or reschedule
> the place, date and time for the auction but any
> change to a later date than May 2020 would be subject
> to [JN's] prior written consent.

Finally, Paragraph 12(a)[2] of the Stingel Agreement set forth

a termination provision (the "Termination Provision").  It

stated:

> In the event that the auction is <u>postponed for
> circumstances beyond our or your reasonable control,
> including, without limitation</u>, as a result of natural
> disaster, fire, flood, general strike, war, armed conflict,
> terrorist attack or nuclear or chemical contamination, we
> may terminate this Agreement with immediate effect.  <u>In
> such event, our obligation</u> to make payment of the
> Guaranteed Minimum <u>shall be null and void</u> and we shall have
> no other liability to you.

---

[2] The Stingel Agreement misnumbered the paragraph regarding
termination rights as a second Paragraph 12.  This Opinion
follows the convention in the pleadings and memoranda and refers
to that provision as "Paragraph 12(a)."

(Emphasis supplied.)[3]

The Stingel Agreement contains a choice of law clause.  The parties agreed that the agreement would be governed by New York law.  Like the Basquiat Agreement, the Stingel Agreement contained an integration clause.

On December 27, 2019, and using the Stingel Painting and another work as collateral, JN obtained a $5 million loan from Muses Funding I LLC ("Muses").  In connection with that agreement, JN, Phillips, and Muses executed a Security Amendment to the Stingel Agreement.  The Security Amendment granted Muses a first-priority lien on the Stingel Painting.  Also under the Security Amendment, Phillips agreed to pay Muses the Guaranteed Minimum and net sale proceeds from the auction of the Stingel Painting.  Like the Stingel Agreement, the Security Amendment acknowledged that the Stingel Painting was to be offered for sale "during the 20th Century & Contemporary Art–NY Auction to be held by Phillips in New York in May 2020 ('Auction')."

In March 2020, as the ferocity of the COVID-19 pandemic became more apparent in New York, Governor Andrew Cuomo declared

---

[3] The parties struck out a separate paragraph in the termination provision of the Stingel Agreement.  That stricken paragraph allowed Phillips to terminate the agreement in the event the US dollar substantially depreciated, the New York or London Stock Exchanges suspended trading, or auctions of similar items had sales prices substantially below their estimates within three months preceding the auction.

a State Disaster Emergency and issued a series of executive
orders restricting and eventually barring all non-essential
business activities until June 2020.  On March 14, Phillips
announced a postponement of auctions.  The announcement on its
website was entitled "Auction Update: Temporary Closures &
Postponements" stating:

> As more of our community of staff, clients and
> partners becomes affected by the spread of the
> Coronavirus, we have decided to postpone all of our
> sales and events in the Americas, Europe and Asia. . .
> .  Our upcoming 20th Century & Contemporary Art sales
> in New York will be held the week of 22 June 2020,
> consolidating the New York and London sales into one
> week of auctions.

In the months that followed the announcement, representatives of
Phillips told JN that they would honor their contractual
commitments with consigners.  On May 26, Phillips raised the
possibility of offering the Stingel Painting at auction in
November 2020.  In connection with that possibility, the parties
discussed potential payment and interest terms.

On June 1, however, the owner of Phillips sent JN's
principal an electronic message of an unsigned copy of a letter
dated May 31, 2020 terminating the Stingel Agreement (the
"Termination Letter").  Phillips mailed a signed copy of the
Termination Letter on June 2, and JN received it on June 4.[4]

--------

[4] Paragraph 17(d) of the Stingel Agreement states, in relevant
part:  "Notices shall be deemed to have been given five (5)

The Termination Letter provides, in relevant part:

> As you are well aware, due to the COVID-19 pandemic, since mid-March 2020 the New York State and New York City governments placed severe restrictions upon all non-essential business activities. . . .
>
> Due to these circumstances and the continuing government orders, we have been prevented from holding the Auction and have had no choice but to <u>postpone</u> the Auction beyond its planned May 2020 date.
>
> We are hereby giving you notice with immediate effect that: (1) Phillips is invoking its right to terminate the [Stingel Agreement]; (2) Phillips' obligation to make payment of the Guaranteed Minimum to you for the Property is null and void; and (3) Phillips shall have no liability to you for such actions that [are] required under applicable governing law.
>
> Our rights to act are as mutually agreed by you and us and are clearly set out in paragraph 12 of the [Stingel Agreement] . . . .

(Emphasis supplied.)

JN alleges that Phillips terminated the Stingel Agreement because it determined that the market for the Stingel Painting had weakened such that Phillips would lose money on the sale after paying JN the Guaranteed Minimum.  JN also asserts that, by the time Phillips sent the Termination Letter, Phillips had already rescheduled the New York Auction to occur on July 2, but did not advise JN of the rescheduling.

---

calendar days after mailing to the address referred to above or within one (1) business day of delivery by hand, email, or facsimile."

On July 2, Phillips held a virtual auction entitled "20TH CENTURY AND CONTEMPORARY ART EVENING SALE NEW YORK AUCTION" (the "Virtual Auction").  Phillips streamed the Virtual Auction from London, but participants could place bids on the featured artwork remotely.

Procedural History

JN filed this lawsuit on June 8, 2020.  On the same day, JN moved for a preliminary injunction and temporary restraining order compelling Phillips to offer the Stingel Painting at its next auction.  JN filed a first amended complaint ("FAC") on June 23.  An Opinion of July 15 denied JN's request for a temporary restraining order.  JN Contemporary Art LLC v. Phillips Auctioneers LLC, --- F.Supp.3d ---, 2020 WL 4014985, at *1 (S.D.N.Y. July 15, 2020).[5]

After Phillips moved for dismissal of the FAC, JN filed the SAC on July 31.  It asserts seven causes of action.  It brings a breach of contract claim under the Stingel Agreement for Phillips' failure to obtain JN's written consent to reschedule the New York Auction to a date after May 2020; for Phillips' "unlawful termination" of that contract; and for Phillips' refusal to offer the Stingel Painting at the New York Auction

---

[5] JN withdrew its request for preliminary injunctive relief following the ruling on the temporary restraining order.

and pay JN the Guaranteed Minimum under the terms of the Stingel
Agreement.  JN claims that Phillips' breaches of the Stingel
Agreement also breached the Basquiat Agreement.  As a fifth
cause of action, JN claims that Phillips violated the implied
covenant of good faith and fair dealing by leading JN to believe
that Phillips would offer the Stingel Painting at the New York
Auction only to terminate the contract, thereby making it
"impossible" for JN to consign the Stingel Painting to another
auction house.  JN asserts that Phillips also violated the
implied covenant by only cancelling its consignment agreement
with JN, while proceeding to auction other pieces that were
consigned for the New York Auction.  JN brings a sixth cause of
action under the doctrine of equitable estoppel, pleading that
Phillips was estopped from terminating the Stingel Agreement
because it indicated to JN that it would include the Stingel
Painting in the New York Auction.  Finally, JN claims that
Phillips breached its fiduciary duty to JN by acting for its own
financial interests in declining to auction the Stingel
Painting.  For each of these claims, JN seeks an order
compelling Phillips to offer the Stingel Painting at its next
auction of contemporary art and comply with the payment
provisions in the Stingel Agreement, including the Guaranteed

Minimum.  In the alternative, JN seeks compensatory damages of
at least $7 million and punitive damages of $10 million.

Phillips filed this motion to dismiss on August 28.  It was
fully submitted on October 2.

## Discussion

"To survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to state a claim to
relief that is plausible on its face."  Geffner v. Coca-Cola
Co., 928 F.3d 198, 199 (2d Cir. 2019) (citation omitted).  "A
claim has facial plausibility when the plaintiff pleads factual
content that allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged."
Charles v. Orange County, 925 F.3d 73, 81 (2d Cir. 2019)
(citation omitted).  "Threadbare recitals of the elements of a
cause of action, supported by mere conclusory statements, do not
suffice."  Empire Merchants, LLC v. Reliable Churchill LLLP, 902
F.3d 132, 139 (2d Cir. 2018).  The plaintiff must plead enough
facts to "nudge[] [its] claims across the line from conceivable
to plausible."  Bell Atlantic, 550 U.S. at 570.

When a party moves under Rule 12(b)(6), Fed. R. Civ. P., to
dismiss for failure to state a claim upon which relief can be
granted a court must "constru[e] the complaint liberally,
accept[] all factual allegations as true, and draw[] all

12

reasonable inferences in the plaintiff's favor." <u>Coalition for Competitive Electricity, Dynergy Inc. v. Zibelman</u>, 906 F.3d 41, 48-49 (2d Cir. 2018) (citation omitted).  "A complaint is . . . deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." <u>Sierra Club v. Con-Strux, LLC</u>, 911 F.3d 85, 88 (2d Cir. 2018) (citation omitted).  The Basquiat and Stingel Agreements are integral to the SAC.

A court may take judicial notice of "relevant matters of public record." <u>Giraldo v. Kessler</u>, 694 F.3d 161, 163 (2d Cir. 2012); <u>see also</u> Rule 201(b), Fed. R. Civ. P. (permitting judicial notice of facts "not subject to reasonable dispute").  Throughout this Opinion, the Court takes notice of state and federal official proclamations and actions related to the COVID-19 pandemic.

I.  Breach of the Stingel Agreement

"To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." <u>Nick's Garage, Inc. v. Progressive Cas. Ins. Co.</u>, 875 F.3d 107, 114 (2d Cir. 2017) (citation omitted).  Under New York law, "a

13

fundamental objective of contract interpretation is to give
effect to the expressed intention of the parties."  In re MPM
Silicones, 874 F.3d 787, 795 (2d Cir. 2017).  If the intent of
the parties is clear from the four corners of a contract, its
interpretation is a matter of law for the court.  Am. Home
Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d
313, 316 (2d Cir. 2006).

> "The initial inquiry is whether the contractual language,
without reference to sources outside the text of the contract,
is ambiguous."  In re MPM Silicones, 874 F.3d at 795.

> An ambiguity exists where the terms of the contract
> could suggest more than one meaning when viewed
> objectively by a reasonably intelligent person who has
> examined the context of the entire integrated
> agreement and who is cognizant of the customs,
> practices, usages, and terminology as generally
> understood in the particular trade or business.

Law Debenture Tr. Co. of New York v. Maverick Tube Corp., 595
F.3d 458, 466 (2d Cir. 2010) (citation omitted).  By contrast, a
contract is unambiguous if its "language has a definite and
precise meaning about which there is no reasonable basis for a
difference of opinion."  Keiler v. Harlequin Enters. Ltd., 751
F.3d 64, 69 (2d Cir. 2014).

> "If a contract is clear, courts must take care not to alter
or go beyond the express terms of the agreement, or to impose
obligations on the parties that are not mandated by the

14

unambiguous terms of the agreement itself." <u>Torres v. Walker</u>, 356 F.3d 238, 245 (2d Cir. 2004) (citation omitted).  In interpreting contracts, "words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." <u>Mastrovincenzo v. City of New York</u>, 435 F.3d 78, 104 (2d Cir. 2006) (citation omitted).  Additionally, "[a]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." <u>LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.</u>, 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted).  "[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." <u>Amidax Trading Grp. v. S.W.I.F.T. SCRL</u>, 671 F.3d 140, 147 (2d Cir. 2011).  When multiple contracts are at issue, "all writings which form part of a single transaction and are designed to effectuate the same purpose must be read together, even [if] they were executed on different dates and were not all between the same parties." <u>TVT Records v. Island Def Jam Music Group</u>, 412 F.3d 82, 89 (2d Cir. 2005) (citation omitted).

"Force majeure clauses are to be interpreted in accord with their purpose, which is to limit damages in a case where the reasonable expectation of the parties and the performance of the

contract have been frustrated by circumstances beyond the control of the parties." Constellation Energy Servs. of New York, Inc. v. New Water St. Corp., 46 N.Y.S.3d 25, 27 (1st Dep't 2017) (citation omitted). Therefore, "when the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure." Id. (citation omitted). Although force majeure clauses "are not to be given expansive meaning," they nevertheless encompass "things of the same kind or nature as the particular matters mentioned." Kel Kim Corp. v. Cent. Markets, Inc., 70 N.Y.2d 900, 902-03 (1987).

"Where a contract does not specify a date or time for performance, New York law implies a reasonable time period." Guilbert v. Gardner, 480 F.3d 140, 149 (2d Cir. 2007). The New York Court of Appeals has applied this principle to contracts that grant a party the right to terminate the agreement but do not specify a time by which the party must provide notice of the termination, holding that "the law implies a reasonable time" as determined by the particular circumstances. Savasta v. 470 Newport Assocs., 82 N.Y.2d 763, 765 (1993); see also, e.g., Tendler v. Lazar, 529 N.Y.S.2d 583, 585 (2d Dep't 1988) (no duty to exercise a contractual right immediately where the contract did not include such a requirement).

16

Phillips moves for dismissal of the breach of contract claims related to the Stingel Agreement.  All of these claims rest on JN's assertion that Phillips breached that agreement by terminating it without cause.  Because the Termination Provision allowed Phillips to terminate the Stingel Agreement, Phillips' motion is granted.

The Stingel Agreement required Phillips to auction the Stingel Painting at a specific New York Auction scheduled to be held in May of 2020.  As the SAC itself admits, this is an auction recognized in the industry as regularly held by Phillips.  The SAC describes Phillips' "evening auction sales of contemporary works of art" as taking place "twice annually."[6] Further, the parties agreed that auctioning the painting for sale at any time after May 2020 would require JN's written consent.  The Termination Provision itself was focused on the postponement of that scheduled auction.  It allowed Phillips to void the agreement "[i]n the event that <u>the auction</u> [wa]s postponed for circumstances beyond [the parties'] reasonable control."  (Emphasis supplied.)

---

[6] Plaintiff's proposed Order to Show Cause for Preliminary Injunction and Temporary Restraining Order likewise defined the term "Evening Auction" as Phillips' "major evening auction sales of contemporary works of art which take place bi-annually in May and November."

Read singly or together, the terms of the Stingel Agreement
dictate that the Stingel Painting be offered at a specific
location and time: Phillips' evening auction of contemporary art
in New York in May 2020.  Phillips' postponement of that auction
-- except for a postponement due to events beyond the parties'
control -- would constitute a material change to the agreement
requiring JN's written consent.

The COVID-19 pandemic and the attendant government-imposed
restrictions on business operations permitted Phillips to invoke
the Termination Provision.  The pandemic and the regulations
that accompanied it fall squarely under the ambit of Paragraph
12(a)'s force majeure clause.  That clause is triggered when the
auction "is postponed for circumstances beyond our or your
reasonable control."

Paragraph 12(a) also provides examples of circumstances
beyond the parties' reasonable control.  Those circumstances
include "without limitation" a "natural disaster."  It cannot be
seriously disputed that the COVID-19 pandemic is a natural
disaster.[7]  One need look no further than the common meaning of

---

[7] Although neither the New York Court of Appeals nor the Second
Circuit Court of Appeals has yet addressed whether the COVID-19
pandemic should be classified as a natural disaster, the Second
Circuit has identified "disease" as an example of a natural
disaster.  Badgley v. Varelas, 729 F.2d 894, 902 (2d Cir. 1984).
Other courts have already determined that the COVID-19 pandemic
qualifies as a natural disaster, as that term is defined by

the words natural disaster.  Black's Law Dictionary defines "natural" as "[b]rought about by nature as opposed to artificial means," and "disaster" as "[a] calamity; a catastrophic emergency."  Natural, Disaster, Black's Law Dictionary (11th ed. 2019).  The Oxford English Dictionary likewise defines a "natural disaster" as "[a] natural event that causes great damage or loss of life such as a flood, earthquake, or hurricane."[8]  By any measure, the COVID-19 pandemic fits those definitions.

Moreover, a pandemic requiring the cessation of normal business activity is the type of "circumstance" beyond the parties' control that was envisioned by the Termination Provision.  The exemplar events listed in Paragraph 12(a) include not only environmental calamities events such as floods or fires, but also widespread social and economic disruptions

---

statute.  See, e.g., Pennsylvania Democratic Party v. Boockvar, 238 A.3d 345, 370 (Pa. 2020) ("We have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster."); Friends of Danny DeVito v. Wolf, 227 A.3d 872, 889 (Pa. 2020).

[8] "[I]t is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract."  10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co., 634 F.3d 112, 119 (2d Cir. 2011) (citation omitted).

such as "general strike[s]," "war," "chemical contamination," and "terrorist attack."

The relevant government proclamations buttress this conclusion.  Governor Cuomo's Executive Orders declared a "State disaster emergency."  And, on March 20, the Federal Emergency Management Agency issued a "major disaster declaration" under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 et seq., due to the COVID-19 outbreak in New York.  See FEMA, DR-448-NY, Initial Notice (March 20, 2020), https://www.fema.gov/disaster-federal-register-notice/dr-4480-ny-initial-notice.

A properly invoked Termination Provision ended Phillips' obligations to JN.  Phillips was no longer required to offer the Stingel Painting at a subsequent auction or to pay JN the Guaranteed Minimum.  It therefore did not breach the Stingel Agreement when it failed to auction the Stingel Painting at the Virtual Auction in July.  Nor was Phillips in breach for failing to obtain JN's written consent to conduct the New York Auction on a date after May 2020.  That consent requirement is only triggered by Phillips' discretionary rescheduling of the New York Auction.[9]

---

[9] JN argues without elaboration that the termination pursuant to the force majeure clause was somehow defective because JN did not receive formal notice of that termination until June 2020.

In opposition to this motion to dismiss, JN first argues
that the New York Auction could have -- and did -- take place in
July 2020 when the Virtual Auction was conducted from London.
The reference in the Stingel Agreement to an auction in New
York, JN argues, is consistent with an auction held over an
internet livestream.  As for the date of the auction, JN submits
that the description of the New York Auction in the Stingel
Agreement as "currently scheduled for May 2020" means that the
May 2020 date was provisional.  JN observes that the auction
date could be moved, pursuant to the agreement's terms, to a
date beyond May 2020 at JN's discretion in the event that the
Stingel Painting was damaged.

These arguments fail.  The Stingel Agreement required
Phillips to offer the painting for sale at an identified,
regularly held, established auction for works of contemporary
art.  This was the Phillips' New York Auction of 20th Century &
Contemporary Art scheduled for May 2020.  Its refusal or failure
to do so would have been a breach of the parties' contract,
unless excused by the contract's terms.  Phillips did not have
the unilateral right to offer the Stingel Painting at an

---

But Paragraph 12(a) imposes no form or timing for this notice.
The SAC does not plausibly plead that the delivery of the formal
notice was unreasonably delayed given Phillips' March notice
that the New York Auction had to be postponed because of the
pandemic.

internet auction or to postpone the auction of the painting
beyond the time of New York Auction.  JN's position overlooks a
number of contract terms.  As but one example, JN does not
explain why the Stingel Agreement required Phillips to obtain
JN's consent to move the auction of the painting to a date
beyond May 2020 if the inclusion of the painting in that
identified auction was not a material term of the Stingel
Agreement.[10]  Once the New York Auction was postponed for
circumstances beyond Phillips' control, Phillips was entitled to
terminate the consignment agreement.

JN emphasizes the principle of ejusdem generis to argue
that a pandemic and the governmental restrictions enacted in
response to a pandemic are not similar enough to the other
circumstances outside of the parties' control that are listed in
the Termination Provision.  Ejusdem generis is an interpretive
guide according to which "the meaning of a word in a series of
words is determined by the company it keeps."  242-44 E. 77th
St., LLC v. Greater New York Mut. Ins. Co., 815 N.Y.S.2d 507,
510 (1st Dep't 2006) (citation omitted).

---

[10] The SAC asserts that the New York Auction was not "postponed,"
but was simply "rescheduled."  The SAC offers no evidentiary
support for this semantic choice.  It does not, for instance,
identify any date on which Phillips has held or will hold a
physical auction in New York of 20th Century & Contemporary Art.

JN's argument on this point is unpersuasive.  As already explained, the pandemic fits within the general definition in the Termination Provision of a circumstance in which a postponement allows termination of the agreement:  a circumstance beyond the parties' reasonable control.  The Provision then explains that such circumstances include "without limitation" a natural disaster and other events.  It is also a principle of construction that the inclusion of listed items cannot narrow the general definition, in particular when the contract indicates that the listed items are not given to limit the definition.  See Israel v. Chabra, 537 F.3d 86, 99-100 (2d Cir. 2008).

In any event, as already explained, the COVID-19 pandemic is fairly described as a "natural disaster".  It is a worldwide public health crisis that has taken untold lives and upended the world economy.

JN next argues that the reference in two Phillips' auction calendars to a "New York auction" shows that Phillips planned to hold the New York Auction in June and then did conduct that auction as the Virtual Auction in July.[11]  The first calendar accompanied the March 14 announcement that Phillips was postponing all auctions.  In the March 14 auction calendar,

---

[11] The calendars are attached to the SAC.

Phillips advised that its "London and New York 20th Century & Contemporary Art Evening Sales [would] be consolidated into one New York auction" to be held on June 24-25.  A subsequent undated auction calendar stated that the London and New York 20th Century & Contemporary Art would be held on July 2 -- i.e., the Virtual Auction.

As an initial matter, the reference in these calendars to the Virtual Auction as a "New York auction" is evidence extrinsic to the parties' agreement.  Consequently, this evidence cannot manufacture an ambiguity in an unambiguous contract.  JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).  The relevant inquiry is what the parties understood the Stingel Agreement to mean when they executed the agreement, not how Phillips chose to continue its operations after the pandemic disrupted its normal business activities.  See Momberger v. Momberger, 948 N.Y.S.2d 713, 715 (3d Dep't 2012).  Phillips' terminology in calendars scheduling and promoting the Virtual Auction did not amend the Stingel Agreement or alter its right to invoke the Termination Provision.

Next, apparently conceding (as it must) that Phillips could not have held an in-person auction in New York during May 2020, JN asserts that the Stingel Agreement required Phillips to exhaust all efforts to perform under the Stingel Agreement

24

before invoking Paragraph 12(a)'s force majeure clause.  JN's
argument is not supported by the terms of the parties' agreement
or by the law.  The parties did not contract for an online
auction conducted in July from London.  Nor is a party to a
contract required to undertake alternative performance before
invoking a force majeure clause.  See Harriscom Svenska, AB v.
Harris Corp., 3 F.3d 576, 580 (2d Cir. 1993) (applying New York
Law); Babcock & Wilcox Co. v. Allied-Gen. Nuclear Servs., 555
N.Y.S.2d 313, 314 (1st Dep't 1990).[12]

JN claims throughout its memorandum of law that Phillips'
decision to invoke the force majeure clause was "pretextual."
If Phillips was entitled to exercise its contractual right to
terminate the Stingel Agreement, its motives for doing so are
irrelevant.  See SATCOM Int'l Grp. PLC v. ORBCOMM Int'l
Partners, L.P., 2000 WL 729110, at *21 n.15 (S.D.N.Y. June 6,
2000); Newfield v. General Motors Corp., 443 N.Y.S.2d 239, 241
(2d Dep't 1981).  As significantly, the SAC recognizes that
following the onset of the COVID-19 pandemic Phillips announced
that it would postpone all of its live auctions.

---

[12] The authorities on which JN relies are not to the contrary.
They state that a force majeure event must prevent performance
as defined in the parties' agreement.  See, e.g., Phillips
Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd., 782 F.2d 314,
319 (2d Cir. 1985); Macalloy Corp. v. Metallurg, Inc., 728
N.Y.S.2d 14, 14 (1st Dep't 2001).

II.   Breach of the Basquiat Agreement

JN next pleads that Phillips' breach of the Stingel Agreement also constituted a breach of the Basquiat Agreement. The Basquiat Agreement, JN asserts, was conditioned upon Phillips' performance of the Stingel Agreement.

This claim is dismissed for several reasons.  As explained above, Phillips did not breach the Stingel Agreement; it exercised its contractual right to terminate the agreement following a force majeure event.  See N. Shore Bottling Co. v. C. Schmidt & Sons, 22 N.Y.2d 171, 176 (1968) (explaining that performance "is simply carrying out the contract by doing what it requires or permits").  Because Phillips was entitled to terminate the Stingel Agreement, JN cannot complain of nonperformance.

Moreover, the Basquiat Agreement is silent about Phillips' obligations pursuant to the Stingel Agreement.  The Basquiat Agreement required JN to execute the Stingel Agreement and Phillips to auction the Basquiat Painting and pay the seller of the Basquiat Painting a guaranteed sum; it did not require Phillips to auction the Stingel Painting or pay JN the Guaranteed Minimum.

In opposition to dismissal, JN argues that the two agreements were the product of a "trade":  JN would guarantee

26

the sale of the Basquiat Painting in exchange for Phillips guaranteeing the sale of the Stingel Painting.  Accepting that statement as accurately describing the parties' motives does not enlarge JN's rights to enforce the contracts as written. Indeed, doing so would be inconsistent with the two Agreements' integration clauses.

III.  The Implied Covenant of Good Faith and Fair Dealing

JN also claims that Phillips breached the covenant of good faith and fair dealing.  "Under New York law, implicit in every contract is a covenant of good faith and fair dealing which encompasses any promises that a reasonable promisee would understand to be included."  Spinelli v. Nat'l Football League, 903 F.3d 185, 205 (2d Cir. 2018) (citation omitted).  The implied covenant of good faith and fair dealing includes a promise that "neither party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations."  Id. (citation omitted).

Nevertheless, "under New York law, the implied covenant of good faith and fair dealing cannot be used to impose an obligation that is inconsistent with express contractual terms." In Touch Concepts, Inc. v. Cellco P'ship, 788 F.3d 98, 102 (2d

Cir. 2015).  That is, the implied right may not be used to "defeat[] a right that a party actually bargained for." Spinelli, 903 F.3d at 206.  Accordingly, where nonperformance is excused by a contract's force majeure provision, the implied covenant does not require substitute performance.  Harriscom Svenska, 3 F.3d at 580.  Further, in order to survive a motion to dismiss, a complaint must supply "specific factual allegations" of bad faith.  Prospect St. Ventures I, LLC v. Eclipsys Sols. Corp., 804 N.Y.S.2d 301, 302 (1st Dep't 2005).

"[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant."  Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 125 (2d Cir. 2013).  "[P]arties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."  Spinelli, 903 F.3d at 206 (citation omitted).  Dismissal of an implied covenant claim is therefore appropriate where the cause of action "is premised on the same conduct that underlies the breach of contract cause of action and is intrinsically tied to the damages allegedly resulting from a breach of the contract."  MBIA Ins. Corp. v. Merrill Lynch, 916 N.Y.S.2d 54, 55 (1st Dep't 2011) (citation omitted).  "[B]ut where . . . there is a dispute over the

meaning of the contract's express terms, there is no reason to bar a plaintiff from pursuing both types of claims in the alternative." Spinelli, 903 F.3d at 206 (citation omitted).

The SAC does not adequately plead a breach of the implied covenant.  JN identifies three breaches as the basis for this claim:  (1) Phillips "schemed" to terminate the Stingel Agreement for its own financial benefit and not because of the COVID-19 pandemic; (2) Phillips misrepresented that it was considering offering the Stingel Painting at a subsequent auction, "lull[ing]" JN into believing that Phillips would offer the Stingel Painting for sale, and preventing JN from seeking its consignment with another auction house; and (3) Phillips treated the Stingel Painting differently than the other consigned items that were scheduled to be auctioned at the New York Auction.

The first basis of the implied breach -- that Phillips pretextually cancelled the Stingel Agreement for financial reasons -- is duplicative of its breach of contract claim.  It is not distinct from the argument that Phillips had an obligation to perform under the Stingel Agreement.  Furthermore, the damages that JN seeks for this claim are identical to those it seeks for its breach-of-contract claims.  The claim for a

violation of the implied duty therefore mirrors JN's breach of contract claim and is dismissed.

Because the Termination Provision of the Stingel Agreement gave Phillips the right to terminate that agreement, JN's other two theories of breach must also be dismissed.  It cannot be a breach of the implied covenant of good faith and fair dealing to do what a contract explicitly authorizes a party to do. Therefore, the fact that, before terminating the contract, Phillips discussed with JN that it was considering moving the Stingel Painting to a November 2020 auction or that it moved other consigned items to the Virtual Auction in July do not constitute breaches of the Stingel Agreement or of the implied covenant.  Finally, the SAC fails to plead adequately that Phillips acted in bad faith when it chose to exercise its contractual right to terminate the Stingel Agreement.

In opposing this motion, JN first argues that it may proceed with this claim because material terms of the Stingel Agreement are in dispute.  As noted above, however, there can be no reasonable dispute about those terms of the Stingel Agreement that are material to this action.  JN cannot fashion a breach of the implied duty claim out of a meritless construction of the parties' agreement.

Next, JN attempts to craft an entirely different theory of breach.[13]  JN argues that its implied covenant claim survives because Phillips was under an obligation to notify JN promptly if Phillips intended to cease performance.  This theory fares no better.  As of March, JN was on notice that there would be no New York Auction held in May 2020.  On or about June 1, Phillips formally terminated the parties' agreement.  The Stingel Agreement imposed no duty on Phillips to provide earlier notice of the termination.

IV.  Breach of Fiduciary Duty

JN asserts that Phillips breached its fiduciary duty to JN. Under New York law, the elements of a claim for breach of fiduciary duty are "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty, and (iii) damages resulting therefrom."  Spinelli, 903 F.3d at 207 (citation omitted). Fiduciaries have a duty to act for the benefit of the principal, subject to the caveat that this duty can be modified by contract.  See Marc Jancou Fine Art Ltd. v. Sotheby's, Inc., 967 N.Y.S.2d 649, 649 (1st Dep't 2013); Reale v. Sotheby's, Inc., 718 N.Y.S.2d 37, 38 (1st Dep't 2000); see also Restatement

---

[13] JN was given two opportunities to amend its complaint, one of which followed the filing of a prior motion to dismiss.  It elected not to include this theory of breach in the SAC. Although outside the pleadings, the Court will consider this theory.

(Second) of Agency § 387 (1958) (emphasis supplied) ("Unless
otherwise agreed, an agent is subject to a duty to his principal
to act solely for the benefit of the principal in all matters
connected with his agency.").[14]

JN's claim for breach of fiduciary duty is dismissed.
Phillips owed JN a fiduciary duty by virtue of the consignment
relationship.  Accordingly, Phillips owed a duty of loyalty to
JN and was required to conduct the consignment faithfully with
JN's business interests at the forefront.  The scope of its
duty, however, was modified by the parties' contract.  That
contract included a force majeure clause which permitted
termination of the parties' agreement.

JN complains, in substance, that Phillips terminated the
Stingel Agreement because it believed the market for the Stingel
Painting had deteriorated and used the COVID-19 pandemic as
pretext to do so.[15]  Whether Phillips' conduct violated its

---

[14] Other courts in this district have applied this principle to
the consignor-consignee relationship.  See, e.g., Mickle v.
Christie's, Inc., 207 F. Supp. 2d 237, 244 (S.D.N.Y. 2002) ("It
is also elementary agency law doctrine, however, that the legal
duties of an agent may be defined and circumscribed by agreement
between principal and agent."); Greenwood v. Koven, 880 F. Supp.
186, 194 (S.D.N.Y. 1995) ("Christie's fiduciary responsibilities
may be modified by agreement.").

[15] In this connection, JN alleges (1) that Phillips did not
inform JN that it would pretextually terminated the Stingel
Agreement; (2) that Phillips did not inform JN that it would
terminate the Stingel Agreement because of a perceived weakness

fiduciary duty to JN, however, depends upon how the Stingel Agreement shaped that duty.  As already explained, the Stingel Agreement unambiguously entitled Phillips to terminate the consignment arrangement following a force majeure event.

JN argues in opposition to this motion to dismiss that a dismissal would ignore the "vast scope of the fiduciary duties [Phillips] owed to plaintiff."  But again, the scope of those duties was circumscribed by the parties' arms-length agreement. Because JN has not adequately alleged that Phillips failed to comply with the terms of their agreement, it also has not alleged that Phillips breached its fiduciary duty.  Phillips' motive in doing what the parties' agreement explicitly permitted it to do is irrelevant.  Therefore, the assertion that Phillips' decision was motivated by its own financial interest does not save the breach of fiduciary duty claim.

V.   Equitable Estoppel

Finally, JN asserts a claim of equitable estoppel.  "The purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the

---

in the market for the Stingel Painting; (3) that Phillips treated the Stingel Painting differently than other consignments; (4) that Phillips' termination of the contract depressed the value of the Stingel Painting; (5) that Phillips acted in its own financial interest; and (6) that Phillips placed its own interests ahead of JN's interests.

reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted." Shondel J. v. Mark D., 7 N.Y.3d 320, 326 (2006).

"Under New York law, the elements of equitable estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts." In re Vebeliunas, 332 F.3d 85, 93-94 (2d Cir. 2003). "The part[y] asserting estoppel must show with respect to [it]sel[f]: (1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in [its] positions." Id. at 94. "[I]n the absence of evidence that a party was misled by another's conduct or that the party significantly and justifiably relied on that conduct to its disadvantage, an essential element of estoppel is lacking." Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P., 7 N.Y.3d 96, 106-07 (2006) (citation omitted).

Equitable estoppel is an "extraordinary remedy." Pulver v. Dougherty, 871 N.Y.S.2d 495, 496 (3d Dep't 2009); E. Midtown Plaza Hous. Co. v. City of New York, 631 N.Y.S.2d 38, 38 (1st Dep't 1995) (same). The doctrine should be "invoked sparingly

34

and only under exceptional circumstances." Luka v. New York
City Transit Auth., 474 N.Y.S.2d 32, 35 (1st Dep't 1984), aff'd,
63 N.Y.2d 667 (1984).

JN claims that Phillips is estopped from terminating the
Stingel Agreement on or about June 1, 2020 for the following
reasons.  Phillips told JN in April 2020 that it would "honor
all contractual commitments with consignors," it used the image
of the Stingel Painting on its website until mid-May, and on May
26, it told JN that it "was considering" moving the auction of
the Stingel Painting to November 2020 and the parties discussed
potential terms related to that move.[16]  JN asserts that these
actions prevented JN from negotiating a replacement guarantee
with another auction house and ultimately had a negative impact
on the valuation of the Stingel Painting.

None of these three acts pleads a misrepresentation or
omission on which JN was entitled to rely.  A general assertion
in April by Phillips that it would abide by all of its contracts
did not eliminate Phillips' right to exercise its rights under
each of those contracts, including its right to terminate the

---

[16] In pleading this claim, JN refers as well to events that
occurred after the contract termination and that cannot
therefore be events on which JN relied.  These include the
conduct of the Virtual Auction from London in July and the
assertion that Phillips did not terminate any consignment
agreements it had for other paintings.

Stingel Agreement.  Nor did the presence of an image of the Stingel Painting on the Phillips' website until mid-May eliminate that right.  At that time, JN was aware that the New York Auction had been postponed and therefore that the plain terms of the Stingel Agreement allowed Phillips to terminate the agreement.  The final assertion relates to the parties' discussions in late May, which apparently failed, regarding moving the Stingel Painting to a different auction under different terms.  Absent from the SAC is any allegation that Phillips assured JN that it would offer the Stingel Painting at a rescheduled auction with the Stingel Agreement's Guaranteed Minimum in full force and effect.  It bears noting, again, that JN was on actual notice since March 2020 that the New York Auction would not be going forward.

## Conclusion

Phillips' August 28 motion to dismiss this action is granted.  The Clerk of Court is directed to close this case.


Dated:    New York, New York
          December 16, 2020


_____
          DENISE COTE
     United States District Judge


36